17 - 3 4 4 6 **BPG** *thru*   17 - 3 4 5 2 **BPG**

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANTS

I, Loi H. Cao, Special Agent with the Federal Bureau of Investigation, being duly sworn, _____ ENTERED
_____ LOGGED _____ RECEIVED

hereby depose and state:

JAN 0 9 2018

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

### I.   Purpose of the Affidavit

1) This affidavit is submitted in support of applications for seizure warrants for:

   a) Any and all funds up to $2,504,696.28 in FineMark National Bank & Trust ("FineMark") account number 05935771094, held in the name of Pelican Colony Partnership, LLC;

   b) Any and all funds up to $75,000 in Citibank account 9145001543, held in the name of MARK GAVER (hereinafter "GAVER") ;

   c) Any and all funds up to $72,507.49 in Branch Banking & Trust Company ("BB&T") account number 0005156776442, held in the name of FRANCES GAVER;

   d) BB&T cashier's check #5008758459 made payable to FRANCES P GAVER on June 12, 2017 in the amount of $200,000; [1]

   e) $200,000 in BB&T funds related to cashier's check#5008758459 made payable to FRANCES P GAVER on June 12, 2017;

   f) GAVER and/or DONNA GAVER Membership interest in The Old Collier Golf Club, up to $194,410.67;

   g) 5,264 shares of Middletown Valley Bank common stock purchased on December 29, 2014, by GAVER,

   hereinafter referred to collectively as the **"Target Accounts."**

---

[1] Your affiant seeks to seize the physical cashier's check as well as the funds related to the check. BB&T has advised the outstanding cashier's check remains negotiable. Item (d) will be served to Frances P Gaver and item (e) will be served to BB&T bank, thus two separate warrants are needed.

all of which your affiant submits constitute proceeds of a bank fraud scheme, in violation of 18 U.S.C. Section 1344 (Bank Fraud), and all of which are subject to seizure pursuant to 28 U.S.C. Section 2461 and 18 U.S.C. Sections 981, and thus may be seized pursuant to 21 U.S.C. Section 853.

## II. **Relevant Legal Authority**

2) *"Proceeds" traceable to bank fraud.* Title 18 U.S.C. Section 981(a)(1)(C) provides civil forfeiture of "any property, real or personal, which constitutes or is derived from proceeds" traceable to any offense constituting "specified unlawful activity" ("SUA"). Title 18 U.S.C. Sections 1956(c)(7) and 1961(1) define SUAs to include bank fraud, in violation of Title 18 U.S.C. Section 1344. Title 28 U.S.C. Section 2461(c) likewise provides for the criminal forfeiture of such property.

3) As explained below, there is probable cause to believe that the funds in the **Target Accounts** are traceable to the proceeds of a bank fraud scheme, and are subject to civil and criminal forfeiture under Title 18 U.S.C. Section 981(a)(1)(C) and Title 28 U.S.C. Section 2461(c).

4) Because the funds in the **Target Accounts** are subject to criminal and civil forfeiture, they are also subject to seizure pursuant to 21 U.S.C. Section 853(f), and 18 U.S.C. Section 981(b).

## III.   **Affiant**

5) I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed with the FBI since October 2008. From November 2014 until the present, I have been assigned to investigate violations of Federal law involving a range of white-collar criminal violations. I have completed several computer internet fraud in-service training courses. During these

courses, I received training concerning the use of computers, IP addresses, and e-mail servers, among other things. I am also a Certified Public Accountant and have been trained in the use of numerous financial computer systems and databases.   Over the course of several investigations, I have consulted with other cyber professionals in the law enforcement field regarding the evidentiary value of computers, storage devices, e-mail and cell phones in conjunction with financial and criminal investigations.

6) Through my training and experience, I have become familiar with the methods and techniques used by criminals to commit economic crimes, such as wire fraud, bank fraud and how those criminals conceal and store information derived from such criminal activity.

7) This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. During the course of conducting or participating in these investigations, I have been involved in the use of the following investigative techniques: interviewing informants, confidential sources, and cooperating witnesses; conducting physical surveillance; consensual  monitoring and recording of both telephonic and non-telephonic communications; and preparing and executing search warrants and arrest warrants.

8) The facts in this affidavit come from my personal observations, my training and experience, and information obtained from witnesses and other law enforcement officers to include Special Agents and Forensic Accountants of the Federal Bureau of Investigation ("FBI").   This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IV.    The Bank Fraud Scheme

9) In or about 1998, GAVER formed GAVER TECHNOLOGIES, INC ("GTI"), also known as GTI FEDERAL, an information technology ("IT") consulting company incorporated in the state of Maryland and based in Frederick, Maryland.

10) Santander Bank, N.A. ("Santander") is a "financial institution" as defined by 18 U.S.C. § 20 whose deposits are insured by the Federal Deposit Insurance Corporation ("FDIC").

11) GAVER, between at least November 2008 and continuing through at least April 2016, submitted materially false financial documents to Santander, including fraudulent audit reports and contract status reports, for the purpose of obtaining a line of credit (LOC), and increasing the amount of that LOC, from Santander for his company GTI. Based upon these materially false submissions by GAVER, Santander ultimately extended a total of $50 million in financing by means of a LOC to GTI. GAVER then diverted a large portion of these fraudulently obtained funds to his own personal use.

12) Santander established bank accounts for GTI through which LOC funds could flow to the company. At times, to obtain the LOC funds, GTI would issue a check on one of these GTI Santander accounts, made payable to itself. This check would then be deposited into one of GTI's bank accounts at other financial institutions, including a bank account maintained at Woodsboro in Maryland. To cover the amount of the check, Santander would transfer funds from the LOC into the applicable GTI Santander bank account.

13) On November 15, 2017, GAVER was charged in a criminal complaint in the District of Maryland on allegations of Bank Fraud. On the same day, GAVER subsequently was arrested in Fort Myers, Florida.

14) On December 5, 2017, GAVER was indicted by the Grand Jury for the District of Maryland, on eight counts of bank fraud and two counts of money laundering. The Indictment contains a forfeiture count in excess of $49 million, the full amount of the bank's loss. A copy of the Indictment is attached hereto as EXHIBIT 1 and incorporated herein.

## V.   Probable Cause

### A. FineMark National Bank & Trust ("FineMark") account number 05935771094 (Pelican Colony Partnership, LLC)- $2,504,696.28:

15) A total of $2,936,151 in bank fraud proceeds are directly traceable to the FineMark account ending in -1094, and associated with Pelican Colony Partnership, LLC. GAVER formed Pelican Colony Partnership, LLC, a limited liability company in the state of Florida, on or about December 16, 2015. GAVER is an authorized signer on the Pelican Colony Partnership, LLC's FineMark bank account, which was funded with transfers from GTI's Santander LOC account, as follows:

a) On July 15, 2016, **$1,785,000** was deposited into the FineMark account ending in -1094 from GTI's Santander bank account ending in -50300.

b) On July 18, 2016, in order to fund the above transfer, $1,848,539 was advanced from GTI's LOC account into GTI's Santander bank account ending in -3553. On the same day, the same amount was transferred from GTI's Santander account ending in -3553 to GTI's Santander account ending in -50300.

c) On November 17, 2016, $1,182,618 was deposited into the FineMark bank account ending in -1094 from GTI's Santander bank account ending in -50300.

d) On November 18, 2016, in order to fund the above transfer, **$1,178,151** was advanced from GTI's LOC into GTI's Santander account ending in -3553. On the same day, the

5

same amount was transferred from GTI's Santander account ending in -3553 to GTI's Santander account ending in -50300.

16) The total amount of illicit bank fraud proceeds transferred into the Finemark bank account ending in -1094 is $2,936,151 (the $1,785,000 deposited on July 15, 2016, Para. 15a, and the $1,178,151 in LOC proceeds deposited on November 17, 2016 (Para. 15d)).  The balance in the Finemark account ending in -1094, as of December 6, 2017, is **$2,504,696.28**, leaving $431,454.72 of illicit bank fraud proceeds that are no longer located in the Finemark account.  However, $75,000 of those funds have been traced to GAVER's Citibank account ending in -1543, as follows:

### B.  Citibank Bank Account Number 9145001543- $75,000

17) On December 8, 2016, **$75,000** was transferred from Pelican Colony Partnership, LLC's FineMark bank account ending -1094 to Mark GAVER's Citibank account ending in -1543.

18) As noted above in the tracing of the FineMark bank account ending in -1094, the account was funded by advances from GTI's LOC with Santander totaling $2,936,151, only $2,504,696.28 of which remains in the Finemark account.

### C.  BB&T Bank Account Number 0005156776442 (Frances Gaver)- $72,507.49:

19) The total amount of directly traceable illicit bank fraud proceeds transferred into the BB&T bank account ending in -6442 is **$378,768** consisting of: a) $275,000 deposit on December 7, 2016 from GAVER's Wells Fargo account ending in -7712 that was funded with LOC proceeds; b) $53,768 in proceeds from the sale of a Maserati purchased with LOC proceeds; and c) $50,000, of a $80,000 wire transfer, from a TD Ameritrade account belonging to GAVER that was funded with LOC advances.  The balance in the BB&T account ending in -6442, as of November 14, 2017, is **$72,507.49**.

6

*Funding of GAVER's Wells Fargo account ending in -7712 with LOC Proceeds*

20) Prior to the December 7, 2016, $275,000 deposit from GAVER's Wells Fargo account

ending in -7712 to BB&T Account -6442, GAVER's Wells Fargo account ending in -7712

was funded with transfers from GTI's Santander LOC totaling $327,000: through: a)

$180,000 in transfers from GTI's Santander account ending in -50300 containing LOC funds

and b) $147,000 in transfers from Gaver Consulting LLC's ("Gaver Consulting") Wells

Fargo account ending in -1770 containing LOC funds,[2] as follows:

   i.   Transfers from GTI's Santander account -50300

b) From April 14, 2016 through November 28, 2016, there were 12 transfers of $15,000

each totaling $180,000 into GAVER's Wells Fargo account ending in -7712 from GTI's

Santander account ending in -50300.

c) From April 19, 2016, through November 30, 2016, there were 12 transfers ranging from

$15,000 to $36,201 and totaling $246,320 into GTI's Santander bank account ending in

-50300 from GTI's Santander bank account ending in -3553.

d) From April 19, 2016 through November 30, 2016, in part in order to fund the above

transfers, there were 12 advances from GTI's LOC ranging from $15,085 to $225,714

and totaling $610,165 into GTI's Santander bank account ending in -3553.

   ii. Transfers from Gaver Consulting Wells Fargo account ending in -1770

e) On May 19, 2016, $75,000 was transferred from Gaver Consulting's Wells Fargo account

---

[2] Your Affiant is *not* seeking seizures of the Wells Fargo Accounts ending in -1770 or -7712 because Wells Fargo account ending in -1770 was closed on September 12, 2016., and the last date of activity in Wells Fargo account ending in -7712 was December 9, 2016, when the balance in the account was overdrawn by $374.06.



-1770 into GAVER's Wells Fargo account ending in -7712; on May 20, 2016, $72,000 was transferred from Gaver Consulting's Wells Fargo account ending in -1770 into GAVER's Wells Fargo account ending in -7712, for a total of $147,000.

    f) On March 22, 2016, $450,000 was deposited into Gaver Consulting's Wells Fargo account ending in -1770 from GTI's Santander bank account ending in -50300.

    g) On March 18, 2016, in order to fund the above deposit, $448,521 was advanced from GTI's LOC account into GTI's Santander account ending in -3553. On the same day, the same amount was transferred from GTI's Santander account ending in -3553 to GTI's Santander account ending in -50300.

21) On December 7, 2016, $275,000 was deposited into FRANCES GAVER'S BB&T bank account ending in -6442 from GAVER's Wells Fargo account -7712.

*Proceeds from sale of Maserati*

22) On March 10, 2017, $53,768 was deposited in FRANCES GAVER's BB&T bank account ending in -6442 from Sam Galloway Ford for proceeds of a sale of a 2012 Maserati Gran Turismo 2 door convertible ("Maserati"). The Maserati was purchased for approximately $157,443 on or about March 28, 2012. The funding for the purchase of the Maserati came from a $200,000 advance from Santander's LOC on March 16, 2012. The Maserati was originally titled in GAVER's name but was retitled in FRANCES GAVER'S name on or about March 1, 2017.

*Transfers from TD Ameritrade*

23) Per paragraph 20, GAVER's Wells Fargo account ending in -7712 was funded with $327,000 in LOC proceeds. On December 7, 2016, $275,000 of proceeds from the -7712 account was

transferred directly to BB&T account ending in -6442.  On December 2, 2016, $50,000 was

transferred from account -7712 directly to GAVER's TD Ameritrade account 488-393213.

24) On May 23, 2017, $80,000 was wired into FRANCES GAVER's BB&T bank account

ending in -6442 from GAVER's TD Ameritrade account ending in 3213 which included

$50,000 of fraud proceeds.

25) The balance of $72,507.49 in the BB&T account ending in -6442 as of November 14, 2017

consisted of the following:

a) $12,507.49 was the lowest intermediate balance in the account on June 20, 2017 after the

deposit of the fraud proceeds noted above;

b) $60,000 was traced to two cashier's checks totaling $60,000 purchased with fraud

proceeds on June 12, 2017.  On June 12, 2017, using the $289,860.73 in proceeds from

the fraud, FRANCES GAVER purchased three BB&T cashier's checks, all made payable

to FRANCES GAVER, totaling $260,000, in the following amounts: (1) $200,000; (2)

$50,000; and (3) $10,000.  On October 10, 2017, the two checks totaling $60,000 were

deposited *back* into the BB&T account ending in -6442.  As of December 6, 2017, your

affiant confirmed that the $200,000 check had not been negotiated and was still

outstanding.

**D & E.  BB&T Cashier's Check #5008758459 dated June, 12, 2017- $200,000**

26) Check #5008758459 dated June 12, 2017 in the amount of $200,000 was made payable to

Frances P. Gaver, as indicated above, paragraph 25(b).  As of December 6, 2017, the check

had not been negotiated and was still outstanding, and thus is subject to seizure.

### F.  GAVER's Membership Interest in The Old Collier Golf Club

27) On or about February 12, 2014, GAVER purchased a country club membership interest for approximately $285,000 at The Old Collier Golf Club located at 790 Main House Dr, Naples, FL 34110 using $194,410.67 in funds directly traceable to the fraudulently obtained LOC proceeds.  The membership interest was paid in three installments, each of which was funded in whole or in part with LOC proceeds.

First Installment

28) On February 12, 2014, $125,000 was paid from Mark & Donna Gaver's BB&T account ending in 1529, of which $34,410.67 was funded with LOC proceeds, as follows:

   a)  Mark & Donna Gaver's BB&T account ending in 1529 was funded with $107,500 in transfers from Gaver Properties Woodsboro account ending in -8056 from January 6, 2014 through February 6, 2014.

   b)  The Gaver Properties Woodsboro account ending in -8056 was funded with $135,826 in transfers from GTI's Woodsboro account ending in 6887 from January 2, 2014 through February 3, 2014.

   c)  GTI's Woodsboro account ending in 6887 was partially funded by a $40,000 transfer from GTI's Santander account ending in -50300, which was funded by a **$34,410.67** advance from GTI's LOC on December 3, 2013.

   d)  The remaining amount of funding into GTI's Woodsboro account ending in 6887 was from deposits of business contract revenue.

Second Installment

29) On February 4, 2015, $80,000 was paid from Mark & Donna Gaver's Wells Fargo account 5674-8926, all of which was funded from LOC proceeds as follows:



a) On January 21, 2015, $75,000 was transferred to Mark & Donna Gaver's Wells Fargo account ending in 8926 from GTI's Santander bank account ending in 50300.

b) On January 21, 2015, in order to fund the above transfer, $200,175 was advanced from GTI's LOC account into GTI's Santander account ending in 3553.  On the same day, $82,427 was transferred from GTI's Santander account ending in 3553 to GTI's Santander account ending in 50300.

c) On January 22, 2015, $15,000 more was transferred to Mark & Donna Gaver's Wells Fargo account ending in 8926 from GTI's Santander bank account ending in 50300.

d) On January 22, 2015, in order to fund the above transfer, $93,789 was advanced from GTI's LOC account into GTI's Santander account ending in -3553.  On the same day, $21,824 was transferred from GTI's Santander account ending in -3553 to GTI's Santander account ending in -50300.

<u>Third Installment</u>

30) On September 23, 2016, a final installment of $80,000 was paid from Pelican Colony Partnership, LLC's FineMark bank account ending in -1094, all of which was funded from LOC proceeds as follows:

a) As noted above in the tracing of FineMark bank account, Pelican Colony Partnership, LLC's account ending in -1094 was funded by advances from GTI's LOC with Santander, including $1,785,000 on July 15, 2016, deposited into the FineMark account ending in -1094 from GTI's Santander bank account ending in -50300, which was funded by a July 18, 2016 transfer from the LOC account into account -3553 and transferred the same day into -50300.

11

Total

31) The total of traceable bank fraud proceeds used to purchase GAVER and/or Donna Gaver's Membership interest in The Old Collier Golf Club is $194,410.67

### G. **Middletown Valley Bank Common Stock**

32) On December 29, 2014, GAVER purchased 5,264 shares of Middletown Valley Bank common stock, at a cost of $100,016 with funds from Mark & Donna Gaver's Wells Fargo account 5674-8926, which contained $105,000 in funds directly traceable to the fraudulently obtained LOC/bank fraud proceeds, as follows:

a)  From November 25, 2014, through December 12, 2014, the Wells Fargo account ending in 8926 was funded with 3 transfers totaling $105,000 from GTI's Santander account ending in 50300.

b)  From November 25, 2014 through December 12, 2014, GTI's Santander account ending in 50300 was funded with $182,572 in transfers from GTI's Santander account ending in 3553.

c)  From November 25, 2014 through December 12, 2014, GTI's Santander account ending in 3553 was funded with $183,718 in advances from GTI's Santander LOC.

## VI.    **CONCLUSION**

33) Based on the facts set forth herein, your affiant submits that there is probable cause to believe that the aforementioned accounts and property contain proceeds of the bank fraud, in violation of 18 U.S.C. Sections 1344, and all of which are subject to seizure pursuant to 28 U.S.C. Section 2461 and 18 U.S.C. Sections 981, and thus may be seized pursuant to 21 U.S.C. Section 853.

_Lr. H. Cao_
Special Agent Loi H. Cao
Federal Bureau of Investigation

Subscribed and sworn to before me this 20TH day of December 2017 in Baltimore, Maryland.

United States Magistrate Judge

13

KOG
12/5/17

RMY/JMG: USAO 2017R00058

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. RDB-17-0640 |
| | * | |
| MARK IAN GAVER, | * | (Bank Fraud, 18 U.S.C. § 1344; Money |
| | * | Laundering, 18 U.S.C. § 1957; |
| *Defendant.* | * | Forfeiture, 18 U.S.C. §§ 982(a)(1), |
| | * | (a)(2)(A)) |

*******

## INDICTMENT

## COUNT ONE

### (Bank Fraud)

The Grand Jury for the District of Maryland charges that:

### Introduction: Relevant Persons and Entities

At all times relevant to this Indictment, unless otherwise stated:

1.     Gaver Technologies, Inc. ("GTI" or "the company"), also known as GTI Federal,

Inc., was an information technology ("IT") support and personnel staffing corporation located in

Frederick, Maryland.   On its website, GTI represented that it was in the business of providing

IT-related support to companies that did business in the fields of science, technology, and

communications, including such services as enterprise management, IT product assurance, and

software system development, integration, and management services.   Several of GTI's clients

were agencies of the federal government.

2.     Defendant **MARK IAN GAVER ("GAVER")** was the sole owner of GTI and held

the positions of President and Chief Executive Officer.   **GAVER** was responsible for making

major business and financial decisions on behalf of GTI, including decisions related to obtaining

EXHIBIT 1

operational financing for the company.

3.      Santander Bank, N.A. (hereafter "Santander," "the financial institution," or "the Bank"), formerly known as Sovereign Bank, was a financial institution as that term is defined in 18 U.S.C. § 20 whose deposits were insured by the Federal Deposit Insurance Corporation (FDIC).   Santander provided commercial and retail banking services to both individual and business customers primarily in the northeastern United States.   Santander Bank, N.A. was a wholly-owned subsidiary of a Spanish company known as Santander Group.

4.      Woodsboro Bank ("Woodsboro") was a financial institution as that term is defined in 18 U.S.C. § 20, whose deposits were insured by the FDIC.   Woodsboro provided commercial and retail banking services to both individual and business customers primarily in the Frederick County, Maryland area.

### The Banking Relationship between GTI and Santander Bank

5.      Starting in or about November 2008, **GAVER**, on behalf of GTI, applied for and obtained an $18.5 million line of credit ("LOC") from Santander to be used by GTI for working capital.

6.      Santander established bank accounts for GTI through which LOC funds could flow to the company.   To obtain the LOC funds, GTI would issue a check on one of these GTI Santander accounts, made payable to itself.   This check would then be deposited into one of GTI's bank accounts at other financial institutions, including a bank account maintained at Woodsboro in Maryland.   To cover the amount of the check, Santander would transfer funds from the LOC into the applicable GTI Santander bank account.

7.      From March 2010 to March 2016, **GAVER**, on behalf of GTI, successfully

2

applied for and obtained eight additional credit line increases from Santander, which increased

the maximum amount of the LOC from $18.5 million to $50 million, as shown below:

| Date | New LOC Maximum |
|------|-----------------|
| March 2010 | $20 million |
| September 2010 | $23.5 million |
| October 2011 | $24.5 million |
| January 2012 | $30 million |
| July 2013 | $35 million |
| September 2014 | $40 million |
| November 2015 | $42.5 million |
| March 2016 | $50 million |

Each credit line increase was documented with an Amended and Restated Loan Agreement and

an Amended and Restated Revolving Line of Credit Note.

    8.    In connection with each successive increase in the LOC, Santander required GTI

to submit certain documentation regarding its financial performance, including but not limited to:

    a.  Audited Annual Financial Statements: complete financial statements audited

by an independent auditor;

    b.  Quarterly Balance Sheets: balance sheets showing a summary of current

assets and liabilities;

    c.  Monthly Borrowing Base Certificates: a certified calculation of the

"borrowing base" (i.e. the maximum amount GTI could borrow under the terms of the LOC),

which was set at 75-80% of GTI's accounts receivable (the outstanding amounts owed to GTI by

3

its customers for past performance).

9.      The original LOC and each successive LOC increase was contingent on the submission of this material documentation by GTI.   Santander relied on the truthfulness of these GTI submissions during the underwriting process for each LOC increase and in extending, and maintaining, each LOC.

### The Scheme and Artifice to Defraud

10.     From in or about November 2008, until in or about December 2016, in the District of Maryland and elsewhere, the defendant,

### MARK IAN GAVER,

did knowingly and willfully devise, execute and attempt to execute a scheme and artifice to defraud Santander and to obtain monies and funds under the custody and control of the Bank by means of materially false and fraudulent pretenses, representations and promises, in that GAVER sought and obtained a line of credit, and subsequent increases in that LOC for GTI from Santander based upon (a) false representations concerning GTI's revenues, accounts receivable, and the number and dollar value of its customer contracts; and (b) his commitment to Santander that the Bank's funds would be used solely for business purposes by GTI, when in fact, GTI had a substantially lower number of contracts, contract revenues and accounts receivable, and GAVER intended to and did divert substantial portions of the LOC for personal expenditures, as set forth in more detail below.

### Manner and Means of the Scheme and Artifice to Defraud

11.     It was a part of the scheme and artifice to defraud that GAVER created false and fraudulent GTI annual financial statements for submission to Santander that falsely purported to

4

be audited by an independent firm of certified public accountants (hereinafter "fraudulent audit reports"). These fraudulent audit reports presented a materially false picture of GTI's revenues, accounts receivable, expenditures, and overall financial condition. For example, the fraudulent audit reports misrepresented and substantially inflated the revenue that GTI had actually collected on its contracts and likewise substantially inflated GTI's accounts receivable.

12.     It was further a part of the scheme and artifice to defraud that **GAVER** falsely represented to Santander that, because GTI's contracts with its government customers were classified, GTI was restricted from sharing copies of the contracts or allowing the Bank to conduct field exams at GTI to examine the physical contracts and complete an audit of GTI's performance on these contracts, because the Bank lacked the necessary security clearances to do so.

13.     It was further a part of the scheme and artifice to defraud that, in or about January 2009, Gaver submitted, and caused to be submitted, to Santander, as part of GTI's application for a LOC, what appeared to be audited financial statements for GTI for the calendar years 2004, 2005, 2006 and 2007. The financial statements that Gaver submitted portrayed GTI as a strong, growing company. More specifically, they represented that GTI's annual revenue grew from approximately $25,428,000 in 2004 to approximately $88,577,000 in 2008, and that its accounts receivable balance grew from approximately $7,497,000 in 2004 to approximately $27,965,000 in 2008.

14.     It was further a part of the scheme and artifice to defraud that, on May 6, 2009, **GAVER** submitted a materially false and fraudulent audit report titled "GTI Audit Report 2008" to Santander in support of GTI's application for an $18.5 million LOC. This fraudulent audit

5

report falsely stated that GTI's total contract revenue had grown from $80 million in 2007 to
over $88 million in 2008, and that GTI's outstanding accounts receivable was over $27 million
as of December 31, 2008.  Based in part upon these false and fraudulent material
representations, Santander agreed to extend the $18.5 million LOC to GTI on or about August
18, 2009.

15.    It was further a part of the scheme and artifice to defraud that, on various
occasions between August 2009 to December 2016, **GAVER** submitted additional materially
false and fraudulent GTI financial statements and audit reports to Santander in support of
subsequent requests for successive increases in GTI's LOC.  Relying on these materially false
and fraudulent documents, Santander approved each of **GAVER's** requests for increases in
GTI's LOC, ultimately bringing the total amount of the LOC to approximately $50 million by
March 2016.

16.    It was a further a part of the scheme and artifice to defraud that, on various
occasions between August 2009 to December 2016, **GAVER** submitted to the Bank, as required
by the LOC agreements, monthly Borrowing Base Certificates ("BBCs") that substantially
inflated the amount of GTI's outstanding accounts receivable, knowing that the borrowing
amount on the LOC available to GTI was directly tied to the amount of GTI's outstanding
accounts receivable.

17.    It was further a part of the scheme and artifice to defraud that, on various
occasions between August 2009 to December 2016, **GAVER** submitted to the Bank, as required
by the LOC agreements, quarterly Contract Status Reports ("CSRs") that either (a) falsely
represented that GTI had secured contracts with federal government agencies such as the Bureau

6

of Alcohol, Tobacco and Firearms (ATF); the Environmental Protection Agency (EPA); the

United States Air Force (USAF); the National Aeronautics and Space Administration (NASA)

and the Department of Labor (DOL) for IT-related services, or (b) substantially overstated the

value of the contract payments that GTI would be entitled to receive under the contracts it did

have with these agencies.   For example, in or about November 2011, **GAVER** falsely

represented to Santander that GTI had received a contract award from NASA whereby it would

be acting as the prime contractor on a matter that would result in contract payments to GTI

totaling approximately $68,725,500.

      18.    It was further a part of the scheme and artifice to defraud that, on various

occasions between August 2009 to December 2016, **GAVER** submitted to the Bank, as required

by the LOC agreements, what purported to be quarterly financial statements for GTI, which in

fact presented a materially false and fraudulent picture of the company's revenues, expenditures,

and overall financial condition.   For example, for calendar year 2014, **GAVER** submitted a false

financial statement to Santander that reported GTI's contract revenue as $214,129,112; however,

GTI's actual contract revenue for that same period was $4,497,009, an overstatement of

$209,632,103.   For calendar year 2015, **GAVER** submitted a false financial statement   to

Santander that reported GTI's contract revenue as $226,728,126; however, GTI's actual contract

revenue for that same period was $5,135,658, an overstatement of $221,592,468.   Individually

and collectively, these purported quarterly financial statements presented a picture of GTI as a

thriving company with rapidly increasing revenues and profitability, whereas, in truth, GTI's

expenses exceeded its revenue and, as of 2015, GTI was losing approximately $2 million or

more annually.

19.     It was further a part of the scheme and artifice to defraud that **GAVER,** for the

purpose of concealing his fraudulent misrepresentations of GTI's actual contract revenue, falsely

advised Santander representatives that the federal government would not permit payments on

contracts from federal government agencies to be directed to GTI accounts held by Santander

because it was a foreign-owned bank.

20.     It was further a part of the scheme and artifice to defraud that **GAVER** transferred

or caused to be transferred large amounts of LOC funds designated for GTI operating expenses

to **GAVER's** personal or separate business bank accounts and used that money for his own

personal benefit.   Among other things, **GAVER** used monies loaned by Santander to GTI to

help fund the company's business operations to buy or rent (a) private planes at a total cost in

excess of approximately $779,000 that he used for non-business purposes, and trips to St.

Maarten, France, Germany, Mexico, Jamaica, and the Bahamas; (b) vacation homes, such as a

house in Bonita Springs, Florida that **GAVER** purchased for $2,275,000; (c) luxury cars, such as

a 2012 Maserati Gran Turismo that **GAVER** purchased for $157,443, and a 2011 Mercedes Benz

SL Class Roadster; and (d) a private membership at an exclusive golf club located in Naples,

Florida that **GAVER** purchased for $300,000.

21.     It was further a part of the scheme and artifice to defraud that **GAVER** obtained,

through false and fraudulent means, at least $49,215,606.18 in LOC funds from Santander,

resulting in a corresponding loss to the Bank of $49,215,606.18.

8

## COUNTS ONE THROUGH EIGHT

### Execution of the Scheme and Artifice to Defraud

22.    On or about the dates indicated below, in the District of Maryland and elsewhere,

the defendant,

### MARK IAN GAVER,

did knowingly and willfully execute and attempt to execute the aforementioned scheme and

artifice to defraud, and to obtain monies and funds owned by, or under the custody and control

of, Santander Bank by means of false or fraudulent pretenses, representations, and promises, in

that he submitted or caused to be submitted to Santander materially false and fraudulent

documents, including but not limited to: audited financial statements, monthly borrowing base

certifications, quarterly financial statements, and monthly contract status reports, in support of

successive applications to Santander by GTI for increases in the amount of funding available to

GTI under its LOC with the Bank, and for the maintenance and continued use of those LOCs

once obtained, as follows:

| COUNT | DATES | SUBMISSION(S) | MAXIMUM LOC AMOUNT |
|---|---|---|---|
| 1 | November 2008 through September 2010 | GAVER emailed "GTI Audited Financial Statements 2007" and "GTI Financials 9-30-08" on November 3, 2008 | $18.5 million |
| 2 | August 2010 through October 2011 | GAVER emailed "GTI Financial Statements" to the Bank on September 21, 2010 | $23.5 million |
| 3 | September 2011 through January 2012 | GAVER emailed "2010 Audit" to Bank on September 6, 2011 | $24.5 million |
| 4 | December 2011 through June 2013 | GAVER emailed "Contract Status Report @ 11-30-11, GTI 2012 Budget, | $30 million |

|   |   | GTI, GTI Financial Statements 11-30-11, GTI Pipeline Report as of 12-13-11" to Bank on December 30, 2011 |   |
|---|---|---|---|
| 5 | July 2013 through June 2014 | **GAVER** emailed "GTI Financial Statements June 2013" to Bank on July 29, 2013 | $35 million |
| 6 | September 2014 through October 2015 | **GAVER** emailed "2013 Audit" to Bank on July 10, 2014 | $40 million |
| 7 | November 2015 through February 2016 | **GAVER** emailed "GTI 2016 Budget, GTI BBC and AR Aging @10-31-2015" to Bank on November 20, 2015 | $42.5 million |
| 8 | March 2016 through December 2016 | **GAVER** emailed "GTI Financial Statements 12-31-2015" to Bank on March 3, 2016 | $50 million |

18 U.S.C. § 1344

## COUNTS NINE AND TEN

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 21 of Count One are incorporated here.

2. On or about the dates set forth below, in the District of Maryland, and elsewhere, the defendant,

## MARK IAN GAVER,

did knowingly engage and attempt to engage in the following monetary transactions by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is the transfer of funds, such property having been derived from a specified unlawful activity, that is, bank fraud in violation of 18 U.S.C. § 1344, in that **GAVER** transferred LOC funds from GTI's Woodsboro account to an account held in the name of **GAVER's** company, Gaver Properties LLC, and used those funds to pay for personal expenditures, including mortgage payments for a $1.275 million vacation home and home improvements.

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| 9 | September 4, 2013 | Transfer of funds in the amount of $75,125 from GTI Woodsboro to **GAVER** Properties, LLC |
| 10 | September 9, 2013 | Transfer of funds of in the amount of $45,000 from GTI Woodsboro to **GAVER** Properties, LLC |

18 U.S.C. § 1957

## FORFEITURE ALLEGATIONS

1.       As a result of his violations of 18 U.S.C. §§ 1344, 1957 and 2, as alleged in

Counts One through Ten of the foregoing Indictment, the defendant,

### MARK IAN GAVER,

shall forfeit to the United States, pursuant to 18 U.S.C. §§ 982(a)(1) and (a)(2)(A), any and all

property, real or personal, that constitutes or that is derived, directly or indirectly, from gross

proceeds traceable to the charged offenses, in the amount of $49,215,606.18, more or less,

including, but not limited to:

    a) Real property at 5051 Pelican Colony Blvd, Unit 1404, Bonita Springs, FL 34134;

    b) Real property at 50 Carroll Creek Way, Frederick, MD Parking Spots: RA, RD,

       RG, RH, RK, RL, RM;

    c) Real property at 13 Woodmere Circle, Middletown, MD;

    d) Real property at 2513 Shelley Circle, Unit #9-2A, Frederick, MD.

2.       If any of the above-described forfeitable property, as a result of any act or

omission of the defendant:

- cannot be located upon the exercise of due diligence;
- has been transferred, sold to, or deposited with a third party;
- has been placed beyond the jurisdiction of the Court;
- has been substantially diminished in value; or
- has been commingled with other property which cannot be divided

      without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C.

§ 982(b)(1), to seek forfeiture of any other substitute property of the defendant up to the value of

the forfeitable property described above.

18 U.S.C. § 982(a)(1)
18 U.S.C. § 982(a)(2)(A)
Fed. R. Crim. P. 32.2(a)

STEPHEN M. SCHENNING
ACTING UNITED STATES ATTORNEY
FOR THE DISTRICT OF MARYLAND

A TRUE BILL: /

SIGNATURE REDACTED

Foreperson

Date:   December __5__, 2017